# EXHIBIT A

**12-Person Jury**

FILED
1/17/2020 9:57 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L000695

8121581

## IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| LINDA VERBOOM CURRY and ALLEN CHEUNG | ) ) ) | NO. __2020L000695__ |
| Plaintiffs | ) | |
| | ) | |
| v. | ) ) | |
| | ) | |
| THE BOEING COMPANY, | ) ) | |
| Defendant. | ) ) | *Plaintiffs Demands Trial by Jury* |

### COMPLAINT

Plaintiffs LINDA VERBOOM CURRY and ALLEN CHEUNG, by and through their attorneys, POWER ROGERS & SMITH, LLP, FRIEDMAN RUBIN PLLP and LITTLEPAGE BOOTH LECKMAN, file this Complaint against the above-named Defendant The Boeing Company (hereinafter referred to as "Boeing") and state as follows:

### PARTIES

1.      Linda Verboom Curry is a citizen of the United States of America, domiciled in Satellite Beach, Florida.

2.      Allen Cheung is a citizen of the United States of America, domiciled in Pembroke Pines, Florida.

2.      Defendant Boeing is a Delaware corporation with its principal place of business and corporate headquarters in Chicago, Illinois.

3.      Jurisdiction and venue are proper in this Court because Illinois is Defendant Boeing's home state and the decisions as well as misconduct of Defendant that form the basis of this complaint occurred in Chicago or was directed from Chicago.

FILED DATE: 1/17/2020 9:57 AM   2020L000695

FILED DATE: 1/17/2020 9:57 AM   2020L000695

## GENERAL FACTS

4.      At all times relevant to this complaint, Defendant Boeing Company was engaged in the business of designing, manufacturing, assembling, testing, servicing, marketing, promoting, leasing and selling commercial aircraft as well as providing information and warnings about such aircraft, including the aircraft at issue.

5.      The facts of this case highlight a previously hidden and "dirty little secret" of the airline industry:  air on Boeing's commercial aircraft (with the exception of the Boeing 787 Dreamliner) can become contaminated and injure flight crew and passengers. Cabin air comes in through the aircraft's engines before entering the cabin and cockpit. This is known as a "bleed air" system because outside air is pulled into - and then "bled" off - the airplane's engines.  The air can become contaminated by heated jet engine oil, hydraulic fluid and the toxic by-products of such chemicals.

6.      Air contamination can occur during both primary events (an immediate and identified failure or leak that occurs contemporaneous with the contaminated air event) as well as secondary events (where jet engine oil, hydraulic fluid or the pyrolyzed by-products leaks, "wisps," "weeps" or "burps" out of an engine over time, becomes lodged in the air system and causes delayed contamination) or a combination of both.

7.      Contaminated air events can produce distinctive odors, including smells described as a chemical, oily or a "dirty socks" smell.

8.      The chemical constituents of burning or heated jet engine oil and its byproducts, include, but are not limited to, neurotoxins such as organophosphates.  Organophosphates are chemical compounds found also in insecticides, herbicides, pesticides, nerve agents, and nerve gases such as Sarin gas.

2

FILED DATE: 1/17/2020 9:57 AM    2020L000695

9.      Inhaling contaminated cabin air can cause short-term or transient symptoms as well as permanent and serious personal injury.

10.     Contaminated air events can also cause serious and potentially catastrophic safety issues. Boeing is aware of a number of incidents where flight crew and / or pilots have become ill or incapacitated because of contaminated air events in-flight.  For example, in 2001, Sweden's Board of Accident Investigations reported on an in-flight incident where both pilots became ill from a contaminated air event.  As Neils Gomer, captain of that aircraft, describes he became confused and severely nauseated and "I just managed to put on my mask, after which I could hardly move. We were sitting there flying at 600 miles an hour, late at night, both of us more or less incapacitated. I could not even raise my hand; I could not talk; it was like I was paralyzed." Many of the 73 passengers on the flight were so deeply asleep it was difficult to wake them up and they appeared to be in a "zombie-like condition."  Captain Gomer fears that if he had delayed going on to oxygen, even by seconds, the aircraft could have crashed. The Swedish Board of Accident Investigation identified an oil leak in one of the engines as well as oil residue on different carbon seals as the source of the contamination and concluded that "the risk that crews can, without warning, be subjected to poisonous cabin air that can substantially reduce their capabilities, or that can temporarily disable an individual crewmember, constitutes a serious threat to flight safety."

11.     By 2007, even Boeing's senior engineers were frustrated with Boeing's refusal to address this safety issue.  As senior Boeing engineer George Bates noted, when commenting on Boeing's utter lack of effort in addressing toxic cabin air events on its airplanes: "*Bottom line is I think we are looking for a tombstone before anyone with any horsepower is going to take interest.*"

FILED DATE: 1/17/2020 9:57 AM    2020L000695

12.     The tombstone Mr. Bates predicted came in 2012 with the death of a British Airways pilot, Richard Westgate. Post-mortem testing of Mr. Westgate's blood and tissue showed elevated autoantibody markers, indicative of neural degeneration. Published medical articles about Mr. Westgate's death confirm that he suffered a nervous system injury consistent with organophosphate-induced neurotoxicity. Duke University Professor Abou-Donia noted that Westgate's injury was "one of the worst cases of organophosphate [OP] poisoning [he had] come across."

13.     But despite Mr. Westgate's death, Boeing has still refused to take any remedial action. Boeing has failed to rectify its flawed and defective bleed air design. Boeing has failed to design, install, implement or provide sensors or alarms to notify the flight crew about contaminated air events so action can be taken to reduce or minimize exposure. Boeing has also failed to design, implement, retrofit or install an air converter or filter into the bleed air system to remove, reduce or mitigate the toxins. Boeing has also failed to provide adequate warnings or training about the dangers.

14.     Boeing has made it clear that safety concerns about contaminated air events are not a priority and, unless there is a financial advantage for Boeing (i.e. that a converter could "buy its way onto the plane") no real efforts will be made to remedy this unreasonably dangerous condition.

## CONTAMINATED AIR EVENT: JANUARY 19, 2018

15.     On January 19, 2018, Linda Curry and Allen Cheung were working as flight attendants onboard a Boeing model 767-300 aircraft, Federal Aviation Administration registration number N644UA ("the subject aircraft"), operated by United Airlines as Flight 71 ("the flight"), which departed from Amsterdam and was destined for Newark, NJ.

16.     The subject aircraft was designed and manufactured by defendant Boeing.

4

FILED DATE: 1/17/2020 9:57 AM 2020L000695

17. About 45 minutes into the flight, there was a contaminated air event onboard when flight crew and passengers reported a "dirty sock" smell. A number of the flight crew and several passengers became ill. A number of flight attendants had to be put on oxygen, including Plaintiffs.

18. The captain contacted MedLink and made the decision to turn the plane around and return to Amsterdam.

19. After landing in Amsterdam, a number of the flight crew and several passengers received medical evaluation and treatment.

20. Due to their exposure to contaminated cabin air, Plaintiffs suffered – and continue to suffer from - short-term and long-term health effects including nausea, confusion, pain, fatigue and exhaustion, balance problems, decreased motor skills, neuropathy as well as numbness and tingling in extremities, joint and muscle pain, tremors, dizziness, vertigo, shortness of breath, problems sleeping, headaches, memory loss, trouble concentrating, cognitive defects, emotional distress, mental anguish, depression, anxiety and aggravation of pre-existing medical conditions.

21. As a result of this event, Plaintiffs have suffered loss of wages and wage-earning capacity in the past and in the future.

## BACKGROUND FACTS

22. With corporate headquarters in Chicago, Boeing employs more than 165,000 people across the United States and in more than 65 countries. Boeing claims it has "one of the most diverse, talented and innovative workforces anywhere."

23. Boeing markets itself as "the world's largest aerospace company and leading manufacturer of commercial jetliners" and claims "a long tradition of aerospace leadership and innovation" including "creating advanced technology solutions." Boeing asserts that "safety is its primary consideration"

5

FILED DATE: 1/17/2020 9:57 AM   2020L000695

24.     For at least sixty years, Boeing, and its predecessors, knew (or should have known) that bleed air can become contaminated and cause serious danger to the health and welfare of crew members and passengers.

25.     Boeing has been put on notice, on more than a hundred occasions, that its bleed air system airplanes are unreasonably dangerous and can cause serious acute and permanent injuries to flight crew and passengers.

26.     Boeing has been long aware that heated engine oil and its toxic byproducts can enter the cabin air system. As early as 1953, Boeing knew the bleed air system was "increasingly subject to unacceptable contamination" and that a decontamination or filter unit was needed to "purify engine bleed air to the point where it is suitable for cabin air conditioning." Yet, to date, Boeing has still not designed, created, implemented, retrofitted or added a filter or converter to the air circulation system of the aircrafts that can safely and effectively protect crew members and passengers from contaminated air events.

27.     Boeing has known since the 1950s that air cabin contamination does not affect everyone to the same degree and some people are physiologically more susceptible to even trace amounts of contaminants.

28.     Boeing is also aware that because of the increased breathing and metabolic rate as well as increased activity of the flight crew, they are more susceptible to injury from contaminated air events.

29.     Toxic cabin air events occur on every type and model of Boeing's airplanes that employ the bleed air system of cabin ventilation.

30.     Contaminated air events occur every day. Boeing tracked over 1,100 toxic air events from 1999 to 2013 and the Defendant assessed 823 of those events as being "potential safety

6

FILED DATE: 1/17/2020 9:57 AM    2020L000695

issues." Boeing's manager for its Air Quality Team, David Space, acknowledges that it is reasonable to expect 4.4 contaminated cabin air events (tracked back to oil or hydraulic fluid) each and every day in the United States of America.

31.    The adverse health effects of contaminated air events are well-documented and serious. The FAA's Office of Aerospace Medicine expert, George Day, describes contaminated air events as when "a potentially toxic environment is created by contaminated bleed air" and the FAA recognizes that exposure to contaminated air events can "result in a spectrum of adverse health effects."

32.    The organophosphate chemicals found in Boeing's jet engine compartments are highly neurotoxic, akin to sarin gas. The World Health Organization (WHO) calls the neurotoxins at issue "major hazards to human health" for which "there is no safe level of ingestion" and cautions that exposure through inhalation should be minimized.

33.    Researchers confirm that exposure to these irritating and toxic chemicals can cause "impairment of neuropsychological function" which can "become more debilitating after time, with problems of loss of cognitive function and memory problems emerging."

34.    Even Boeing acknowledges that flight attendants and passengers develop "real symptoms" from these events.

35.    Published articles acknowledge that exposure to oil fumes can cause "both acute and chronic neurological and respiratory symptoms" and can compromise flight safety. As one study noted, "a clear cause and effect relationship has been identified" between contaminated air events and the development of acute and chronic adverse effects involving the neurological and neurobehavioral systems.

FILED DATE: 1/17/2020 9:57 AM    2020L000695

36.     Harvard Professor, as well as Boeing consultant and retained expert, Jack Spengler confirms that flight crews "complain of headaches and eye, skin and upper airway irritation in the short term but go on to experience neuropsychological impairment" as well as other chronic conditions.

37.     In 2004, Boeing launched the Boeing 787 Dreamliner, a commercial aircraft that does not use a bleed air system.  The Dreamliner air system eliminates the risk of engine oil decomposition products being introduced in the cabin air supply.  One of the reasons Boeing developed a new air supply system for the Dreamliner was to eliminate "engine contaminants potentially entering cabin air supply- Improved Air Quality."

38.     ***Boeing has failed to investigate, study, identify or quantify  the toxins present during a contaminated air event:***  As a threshold step to appropriately addressing the safety hazard of contaminated air events, Boeing needed to create a list of possible contaminants present during a cabin air event. To date, Boeing still has not finalized a list of bleed air and cabin contaminants or surrogates of interest.

39.     Boeing has never captured, documented, evaluated, assessed or analyzed a contaminated air incident in-flight. Shockingly, even today, Boeing cannot tell the public what toxins are even present during a contaminated air event or at what levels. Boeing's executive Jacob Bowen admits he has "never seen any data off of an actual airplane" during a contaminated air event.  Boeing's senior engineer George Bates confirms that Boeing has "no data of air contamination during a fume or upset event." Rather, Boeing's typical investigation of a contaminated air event involves examining the airplane hours to days after the event,  by which time the doors have been opened, the passengers and crew have disembarked, and the contaminated air has dissipated. Even Boeing's chemist Jean Ray agrees that "unless you're actually there

8

FILED DATE: 1/17/2020 9:57 AM   2020L000695

monitoring" during the contaminated air incident, "there's no way to know for sure what contaminants were there during that event." So while Boeing knows it is exposing its customers to various levels of poisonous gas, Boeing has done nothing to study the levels of gas present, their varying causes, or the adverse health effects on passengers and crew.

40.     All in-flight air samples done to date thus capture only normal flight operations. And even that data is alarming: the neurotoxin tricresyl phosphate (TCP) has been found on airplanes during even normal operation. Independent researchers confirm that, when cabin air was tested even under normal flying conditions, "significant concentrations of organophosphate neurotoxins and other noxious substances in cabin air" were found. In 2009, when investigative reporters secretly took wipe samples from inside a number of airplanes, all under normal operations, "out of 31 samples, 28 were found positive for TCP."

41.     Boeing consistently represented that it was committed to studying and gaining "a comprehensive understanding of air quality components through research and analysis." In reality, Boeing repeatedly cut or removed funding from air quality projects.

42.     *Boeing downplayed, minimized and misrepresented the true incidence rate for contaminated air events*.  Boeing has repeatedly provided inaccurate or outdated incidence statistics to the traveling public and flight crews. Through these misrepresentations, Boeing encouraged complacency, deterred and distracted research efforts and impeded or prevented development and implementation of safer technologies

43.     *Boeing failed to develop, install or implement filters or converters*.  Feasible and effective filters and converters, which could remove or significantly reduce airborne toxins, have been available since 2003. The most well-tested of these is the Combined Hydrocarbon Ozone Converters (CHOC) which Boeing could have, and should have, installed on its bleed air planes.

9

FILED DATE: 1/17/2020 9:57 AM   2020L000695

CHOC converters function similar to a filter except the CHOC captures the toxic contaminants and turns those chemicals into more benign compounds. CHOC converters are effective at reducing contaminants, thus making the bleed air system safer for passengers and crew.

44.     Adding CHOC converters to Boeing planes would be easy, as the CHOC slides right into the same slot in the bleed air system as the existing ozone converter. The CHOC unit actually fits into "the same envelope space as the ozone converter" and is essentially a drop-in replacement for the ozone converter which provides advancement "at little to no extra cost." The CHOC has the same durable, lightweight design and same long-lasting, high efficiency as the currently utilized ozone converter. As Boeing's lead engineer and FAA designated representative Jane Vitkuske noted, the benefits of the CHOC technology include "minimal cost" and little "weight impact."

45.     Boeing's main competitor, Airbus, started installing CHOC converters on Airbus planes in 2006 to 2007. Boeing has still not adopted or implemented this safer alternatives.

46      Boeing consistently and repeatedly refused to allocate adequate resources for the research, development and installation of converters or sensors. Indeed, Boeing repeatedly cut or eliminated budgets for such research and development. On multiple occasions, Boeing put entire air quality projects "on hold" or delayed approving funding by months and even years.

47.     Boeing has now opted to install CHOC converters on some of its bleed airplanes, starting in the 2021 timeframe, a decision that comes too late to save the Plaintiff.

48.     ***Boeing failed to design, install or implement sensors***. Boeing's planes have more than fifty sensors onboard and many of them trigger warnings for the pilots in-flight. But Boeing has never installed a sensor to warn of a contaminated air event. This is because Boeing's

10

FILED DATE: 1/17/2020 9:57 AM 2020L000695

management refused to fund the research and development efforts necessary to develop and implement such technology.

49.     A pilot's ability to detect a contaminated air event in-flight is important because, in the cockpit, there is a simple switch that allows the pilot to shut off inflowing air from either engine.  If the pilot knows contaminants are entering the air supply because of issues from a specific engine, with just a flip of a switch, the pilot can shut down the air flow on that side of the plane and protect passengers and crew from the toxins.

50.     While pilots have access to pure oxygen masks in the cockpit, and pilots must put them on during contaminated air events to prevent incapacitation, there is no such protection available for passengers and flight attendants. The masks that fall from the overhead compartment in the cabin allow for only 4-15 minutes of oxygen. Sensors are thus important to provide an early warning so pilots can block contaminated air from entering the cabin.

51.     Pilots want sensors as they consider contaminated air events to be "safety" issues and do not want "passengers used as guinea pigs in seats." The Airline Pilots Association notes that the development and installation of sensors for guarding against toxic cabin air events is "[t]he single most important safety item" for pilots.

52.     The flight crew unions also want sensors. The FAA wants sensors. Industry organizations such as ASHRAE have demanded sensors. Independent scholarly organizations like the National Research Council recommend sensors.

53.     Although a number of sensors have been developed and approved for use in flight, Boeing steadfastly refuses to install them.  Boeing's engineers admit that one reason for Boeing's reticence is that Boeing fears the information captured by those sensors (*i.e.* exactly what toxins

FILED DATE: 1/17/2020 9:57 AM    2020L000695

were actually present during an event and at what levels) could be used against Boeing in litigation. To protect itself, Boeing is willing to risk the safety of passengers and flight crew.

54.    Boeing has long known that its bleed air system is defectively designed. Boeing is aware that safety measures exist or could be developed to mitigate or eliminate the danger. Boeing has made affirmative and intentional decisions *not* to investigate, develop or employ those measures.

55.    Boeing has ample resources to investigate, research, develop and implement safer alternatives. In Boeing's 2018 Annual Report, Defendant reported annual revenue of $101.1 billion. Despite these resources, the Boeing aircraft at issue had a defectively designed bleed air system, was not equipped with appropriate converters or filters to remove air contaminants and did not have a sensor to warn the flight crew. Further, Boeing provided the flight crew with no training on how to handle a contaminated air incident or how to isolate the source of the air contamination so such contamination could be reduced, avoided or stopped.

56.    Boeing knew that cabin air could become contaminated, knew that such contamination could cause health problems and knew that safer alternatives were available that were technologically available and economically feasible. Yet Boeing did not redesign or retrofit the subject aircraft to eliminate or reduce these hazardous events.

57.    Rather than admit the truth about air cabin contamination, Boeing instead deliberately misrepresented the safety of its aircraft. In 1995, for example, Boeing represented at the Aeromedical Medical Association annual meeting that the ECS or Environmental Control System of "today's jetliner is carefully engineered to provide superior cabin air quality."

58.    By 1996, Boeing knew that airlines, including United Airlines, had "expressed concern with bleed air contaminants." Rather than be truthful, Boeing instead told the airlines that

FILED DATE: 1/17/2020 9:57 AM   2020L000695

the "air quality contaminants meet health and safety guidelines" and acute symptoms were caused by warmer temperatures and "control of the heat in the cabin," rather than toxins.

59.     In 2000, Boeing provided affirmative representations to United Airlines flight crew in an article called "Partners in Safety: Cabin Air Quality."  Boeing reassured United flight attendants that their health was "always a top priority" and that symptoms experienced by flight attendants such as "fatigue, headaches, dizziness, light-headedness, nausea, sore throat and illness" was often mistakenly attributed to cabin air quality but flight crew should instead look to other causal factors such as altitude, jet lag, turbulence, dehydration and stress.  Boeing had a prime opportunity to educate United flight crew about this safety hazard and, instead, Boeing misrepresented, downplayed and minimized the danger.

60.     Boeing consistently represented that cabin air quality studies did not indicate that contaminants were affecting cabin air quality.  Boeing thus encouraged airlines and crew to look at "multiple factors" as the cause of poor cabin air quality.  Further, Boeing reassured flight crew that there were "no additional precautions" that could be taken to improve air quality.  In reality, Boeing could have, and should have, installed converters and sensors in its bleed air system planes.

61.     Boeing executives have affirmatively represented that Boeing aircraft are safe.  For example, in 2011, Boeing engineer David Space discussed cabin air quality with various airlines and stated that Boeing was committed to providing a "safe, healthy, flying environment." Boeing also represented that its air delivery system "is carefully engineered to provide superior cabin air quality."

62.     By reason of Boeing's decisions, the subject flight attendant crew were exposed to contaminated bleed air, the environmental control system on the subject aircraft lacked converters or filters which would have reduced or eliminated the toxic fumes and

there was no sensor or warning on the subject aircraft to warn the flight crew so remediation action could be taken.

63. By reason of Boeing's decisions, the subject flight attendants were not properly warned of the health dangers of contaminated cabin air and were ill equipped to respond to this incident.

64. Boeing knew of the defects in the subject aircraft, knew that because of such defects the cabin air was not free from harmful or hazardous concentrations of contaminants, was on notice that the defects were likely to cause injury yet failed to adequately warn or instruct on the aircraft defects, failed to remedy the known defect in the subject aircraft, failed to discover the dangerous conditions when such could have been discovered and / or failed to take affirmative action to avoid injury to Plaintiffs and others.

## COUNT I: Strict Liability: Design Defect

65. Boeing manufactured, designed, promoted, marketed and sold the subject aircraft. At the time the subject aircraft left Boeing's custody and control, it was defective and unreasonably dangerous because:

      a.    Its design rendered the aircraft unreasonably dangerous.

      b.    The danger of this design was beyond that contemplated by the ordinary consumer with ordinary knowledge common to the community as to its characteristics.

      c.    The benefits of this design are outweighed by the design's inherent risk of danger.

66. Boeing's design of the subject aircraft made such aircraft unreasonably dangerous in one of more of the following respects:

      a.    The subject aircraft's ventilation system allows bleed air, which can become contaminated with dangerous toxins, to enter the cabin and cockpit air.

      c.    The subject aircraft lacked adequate air quality monitors, sensors or alarms.

14

FILED DATE: 1/17/2020 9:57 AM   2020L000695

FILED DATE: 1/17/2020 9:57 AM   2020L000695

    d.     The subject aircraft provides no safeguards or systems so the flight crew could identify the source of the contaminated air or mitigate or prevent contamination of the cabin air.

    e.     The subject aircraft lacked adequate or appropriate converters or filters to reduce, remove or eliminate bleed air contamination.

67.     By reason of the foregoing, the subject aircraft was unreasonably dangerous and defective, and Boeing is strictly liable for the damages sustained by the Plaintiffs.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY in an amount of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00).

### COUNT II: Strict Liability: Defect in Warnings / Instructions

68.     Plaintiffs re-allege all previous paragraphs as if set forth verbatim herein.

69.     Boeing failed to adequately warn of the danger of toxic cabin air and / or failed to adequately instruct on the proper use of its aircraft to avoid cabin air contamination in one of more of the following respects:

    a.     The subject aircraft lacked proper warnings regarding the potential of the air supply system to become contaminated.

    b.     The subject aircraft lacked proper warnings regarding the identification or detection of contaminated air.

    c.     The subject aircraft lacked proper warnings regarding the health dangers of exposure to contaminated air.

    d.     Defendants failed to adequately warn or instruct on how to respond, contain or reduce the danger of contaminated air events.

70.     By reason of the foregoing, the subject aircraft was unreasonably dangerous and defective, and Boeing is strictly liable for the damages sustained by the Plaintiffs.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY in an amount of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00).

FILED DATE: 1/17/2020 9:57 AM   2020L000695

### COUNT III: Negligence

71.     Plaintiffs re-allege all previous paragraphs as if set forth verbatim herein.

72.     At all times relevant hereto, Boeing owed a duty to the Plaintiffs to use reasonable care in designing, manufacturing, assembling, testing, maintaining, servicing, selling, marketing, promoting and providing warnings or instructions about the subject aircraft so as not to cause Plaintiffs severe personal injuries and pain and suffering.

73.     Boeing negligently breached its duty of care owed to the Plaintiffs through one or more of the following negligent acts and omissions, when Boeing:

a.      Negligently designed, manufactured, assembled and sold the subject aircraft such that its ventilation system allowed contaminated bleed air to enter the breathing zone of the aircraft.

b.      Negligently designed, manufactured, assembled and sold the subject aircraft without an adequate or appropriate air quality monitor, sensor or alarm to detect bleed air contamination, to allow the flight crew to identify the source of such contamination and / or permit the flight crew to mitigate, reduce or prevent fume events.

c.      Negligently designed, manufactured, assembled and sold the subject aircraft without adequate or appropriate converters or filters to protect cabin air from contamination.

d.      Negligently designed, manufactured, assembled and sold the subject aircraft without proper warnings or instructions regarding the potential of the air supply system to become contaminated or the danger of exposure to such contaminated air.

e.      Negligently designed, manufactured, assembled and sold the subject aircraft without knowing the chemical composition of heated aviation jet engine lubricating oil or hydraulic fluid or the by-products of such as well as the toxicity of these toxins.

f.      Negligently designed, manufactured, assembled and sold the subject aircraft without knowing what chemicals or byproducts are created when aviation jet engine lubricating oil or hydraulic fluid is heated to temperatures consistent with those experienced in the engines.

g.      Negligently designed, manufactured, assembled and sold the subject aircraft without properly testing heated aviation jet engine lubricating oil or hydraulic fluid to fully understand the toxic chemicals and by-products of such.

h.      Negligently designed, manufactured, assembled and sold the subject aircraft without knowing the quality of the bleed cabin air.

16

FILED DATE: 1/17/2020 9:57 AM   2020L000695

    i.       Negligently failed to incorporate a proper and effective environmental control system or air supply on the subject aircraft.

    k.      Negligently failed to properly test the subject aircraft before selling or distributing it;

    l.       Negligently failed to adequately maintain, service, retrofit and/or inspect the subject aircraft or add the needed safer alternatives.

    m.    Negligently represented, promoted and marketed its aircraft as being safe and failed to provide adequate warnings and instructions about its aircraft; and

    n.      Was otherwise negligent and careless.

74.     Boeing owed a duty to adequately warn and instruct about the dangers of its aircraft of which it knew, or, in the exercise of ordinary care, should have known, at the time the product left Boeing's control.

75.     Boeing negligently failed to warn of the defective and unreasonably dangerous conditions of the subject aircraft.

76.     Boeing misrepresented the safety of its aircraft and the dangers of air cabin contamination.

77.     As a direct and proximate result of one or more of the aforesaid negligent acts and omissions of Boeing, Boeing caused Plaintiffs to suffer personal injuries and damages.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY in an amount of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00).

## COUNT IV: Fraud

78.     Plaintiffs re-allege all previous paragraphs as if set forth verbatim herein.

79.     Boeing, having undertaken to design, create, research, develop, manufacture, market, promote, lease and sell its aircraft, owed a duty to provide a safe and appropriate air system as well as accurate and complete information regarding its aircraft.

FILED DATE: 1/17/2020 9:57 AM   2020L000695

80.     Instead, Boeing provided affirmative misrepresentations or omissions and falsely and deceptively sought to create the image and impression that the air cabin in its aircraft was safe.

81.     As described in some detail above, Boeing purposefully concealed, failed to disclose, misstated, downplayed, and understated the health hazards and risks associated with cabin air contamination on its aircraft.

82.     Boeing deceived flight crew, flight attendants and passengers by concealing, misstating, and downplaying the incidence rate, seriousness and health effects of fume events.

83.     Boeing falsely and deceptively kept relevant and material information from flight crew, flight attendants and passengers and minimized concerns regarding the safety of its aircraft air system.

84.     Boeing did not properly study nor report accurately the results of its analysis of cabin air contamination.

85.     As a direct and proximate result of one or more of the aforesaid fraudulent acts of Boeing, Boeing caused Plaintiffs to suffer severe personal injuries and damages.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY in an amount of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00).

<u>**COUNT V: Res Ipsa Loquitur**</u>

86.     The Plaintiffs' injuries were caused by the subject Boeing aircraft that they were on at the time of each of their exposures.

87.     The Plaintiffs are foreseeable end users of Boeing's aircraft.

88.     Defendant Boeing had a duty to prevent the Plaintiffs from being harmed by its aircraft.

18

FILED DATE: 1/17/2020 9:57 AM    2020L000695

89.     The subject aircraft, as well as the entire Environmental Control System (ECS) and bleed air system of this plane, was under Defendant Boeing's exclusive control and management.

90.     Defendant Boeing exclusively decided whether or not to affix its aircraft with sensors and / or converters and no other entity could do so without its authority.

91.     Defendant Boeing had a duty to the Plaintiffs to anticipate or guard against.the contaminated air event which caused the Plaintiffs' injuries.

92.     The occurrence which injured the Plaintiffs is such that, in the ordinary course of things, it would not have happened if Boeing had used proper care to affix sensors and / or converters to the aircraft.

93.     Had Boeing installed air quality sensors and / or appropriate converters on the subject aircraft such devices would have warned the crew so mitigating efforts could have been taken.  Boeing could have removed or converted harmful contaminants from the bleed air system and could have minimized, reduced or eliminated Plaintiffs' exposure to contaminated air.

94.     The fume event itself affords reasonable evidence that it arose from want of proper care by Defendant Boeing.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY in an amount of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00).

### COUNT VI:  Damages

95.     Boeing's conduct caused Plaintiffs short term and long term health problems and injuries including pain, suffering, mental anguish, emotional distress, physical impairment, loss of normal enjoyment of life, medical bills and expenses as well as loss of wage earning capacity, in the past as well as reasonably anticipated in the future.

FILED DATE: 1/17/2020 9:57 AM    2020L000695

## DEMAND FOR JURY TRIAL

96.    Plaintiffs hereby demand a jury trial on all claims so triable in this action.

WHEREFORE, Plaintiffs pray for the entry of a judgment in their favor and against Defendant Boeing, together with costs, attorney fees and such other damages as may be allowed by law.

Signed this 17th day of January, 2020.

_____
Attorneys for Plaintiffs

Joseph A. Power, Jr.
Kathryn L. Conway
POWER ROGERS AND SMITH, LLP
Three First National Plaza
70 West Madison Street, 55th Floor
Chicago, IL 60602
Tel: (312) 236-9381

Zoe Littlepage
Rainey Booth
Matt Leckman
LITTLEPAGE BOOTH LECKMAN
1912 W. Main St.
Houston, TX 77098
Tel: (713) 529-8000

Rick Friedman
Alisa Brodkowitz
Rachel M. Luke
FRIEDMAN RUBIN
1126 Highland Ave.
Bremerton, WA 98337
Tel: (360) 782-4300