UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LINDA VERBOOM CURRY and ALLEN CHEUNG,          )
                                                )
                                  Plaintiffs,   )          20 C 3088
                                                )
                      vs.                       )          Judge Gary Feinerman
                                                )
THE BOEING COMPANY,                             )
                                                )
                                  Defendant.    )

## MEMORANDUM OPINION AND ORDER

Linda Verboom Curry and Allen Cheung sued The Boeing Company in the Circuit Court

of Cook County, Illinois, for injuries allegedly suffered while they were flight attendants on a

transoceanic flight on a Boeing aircraft. Doc. 1-1. Boeing removed the suit to federal court,

Doc. 1, and moves under Civil Rule 12(b)(6) to dismiss some of Plaintiffs' claims, Doc. 10.

Plaintiffs move under 28 U.S.C. § 1447(c) to remand the suit to state court. Doc. 17. Plaintiffs'

remand motion is denied, and Boeing's partial motion to dismiss is granted.

### Background

In resolving Plaintiffs' remand motion, the court bears in mind that "[t]he party seeking

removal has the burden of establishing federal jurisdiction" and that it must "interpret the

removal statute narrowly, resolving any doubt in favor of [Plaintiffs'] choice of forum in state

court." *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 758 (7th Cir. 2009). The court

assumes the truth of the operative complaint's allegations at the time of removal, but also may

consider facts set forth in the notice of removal. *See Elftmann v. Vill. of Tinley Park*, 191

F. Supp. 3d 874, 878 (N.D. Ill. 2016) ("In considering a motion for remand, the court must

examine the plaintiffs' complaint at the time of the defendant's removal and assume the truth of

1

all factual allegations contained within the original complaint.") (internal quotation marks

omitted); 14C Arthur R. Miller *et al.*, *Federal Practice and Procedure* § 3739 (West 4th ed. Oct.

2020) ("Whether an action should be remanded to state court must be resolved by the district

court with reference to the complaint, the notice of removal, and the state-court record at the time

the notice of removal was filed.").

In resolving Boeing's Rule 12(b)(6) motion, the court assumes the truth of the operative

complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v.*

*N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider

"documents attached to the complaint, documents that are critical to the complaint and referred

to in it, and information that is subject to proper judicial notice," along with additional facts set

forth in Plaintiffs' brief opposing dismissal, so long as those additional facts "are consistent with

the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013).

The facts are set forth as favorably to Plaintiffs as those materials allow. *See Pierce v. Zoetis,*

*Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court

does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir.

2018).

On January 19, 2018, Plaintiffs were working as flight attendants aboard United Airlines

Flight 71, which was bound from Amsterdam, Netherlands, to Newark, New Jersey. Doc. 1-1 at

¶ 15. The aircraft, a 767-300, was designed and manufactured by Boeing. *Id*. at ¶¶ 15-16.

"About 45 minutes" after takeoff, passengers and crew reported a "dirty sock" smell. *Id*. at ¶ 17.

Many fell ill, and some—including Plaintiffs—had to be put on oxygen. *Ibid*. The captain

eventually decided to return the plane to Amsterdam. *Id*. at ¶ 18. Since the incident, Plaintiffs

have suffered health problems, resulting in a loss of wages and earning capacity. *Id*. at ¶¶ 20-21.

An in-flight "dirty sock" smell is indicative of a "contaminated air event." *Id*. at ¶¶ 6-7. Most Boeing aircraft use a "bleed air" system, by which air is pulled in through the engines before circulating in the cabin and cockpit. *Id*. at ¶ 5. Certain substances in the engines—such as heated jet engine oil, hydraulic fluid, and their byproducts—can contaminate the air before it reaches the inside of the plane. *Id*. at ¶¶ 6-8. The contamination can expose passengers and crew to harmful chemicals akin to those found in pesticides and nerve gases. *Id*. at ¶¶ 8, 32. Inhalation of those chemicals can cause short-term illness and long-term injury. *Id*. at ¶¶ 9, 35-36.

Plaintiffs allege that the potential for contaminated-air events on Boeing aircraft is a "dirty little secret" in the airline industry, *id*. at ¶ 5, and that Boeing has long been aware of the problem and its dangers, *id*. at ¶¶ 10-11, 24-28. For instance, in 2012, a British Airways pilot died of injuries consistent with inhalation of air contaminated by jet-engine byproducts. *Id*. at ¶ 12. Yet Boeing has never fixed or attempted to fix the allegedly defective design of its aircraft fitted with bleed-air systems, nor has it provided warnings or training about the dangers of air contamination. *Id*. at ¶¶ 13, 26, 38-39, 48, 53-54. Contaminated-air events continue to occur aboard Boeing planes every day. *Id*. at ¶ 30.

In addition to its failure to address air-cabin contamination, Plaintiffs allege that Boeing has deliberately and repeatedly misrepresented the safety of its fleet. *Id*. at ¶¶ 57-61. In 1996, in response to concerns raised by airlines about air contamination, Boeing asserted that the air quality in its planes' cabins met relevant guidelines and that any reported symptoms among flight crews were caused by cabin temperature, not air toxins. *Id*. at ¶ 58. In 2000, the company published an article noting that flight attendants often attributed symptoms such as fatigue, headaches, and nausea to air quality in the cabin, but claiming that the symptoms in fact

stemmed from other causes, such as jet lag or dehydration. *Id*. at ¶ 59. And in 2011, a Boeing engineer told airlines that the company was committed to, and its fleet designed for, providing healthy air to passengers and crew. *Id*. at ¶ 61.

The complaint asserts six counts. *Id*. at ¶¶ 65-95. The first four counts are strict liability for defective design, *id*. at ¶¶ 65-67 (Count I); strict liability for defective warning and instruction, *id*. at ¶¶ 68-70 (Count II); negligence, *id*. at ¶¶ 71-77 (Count III); and fraud, *id*. at ¶¶ 78-85 (Count IV). The other two are a count under the doctrine of *res ipsa loquitur*, *id*. at ¶¶ 86-94 (Count V), and a standalone count for damages, *id*. at ¶ 95 (Count VI).

On May 25, 2020, four months after being served with the complaint, Boeing removed the suit to federal court. Doc. 1. A week later, Boeing moved to dismiss the fraud and *res ipsa loquitur* counts. Doc. 10. Plaintiffs then moved to remand the suit to state court. Doc. 17.

## Discussion

## I.     Plaintiffs' Motion to Remand

"A motion to remand must be granted if the case removed from state court could not have been brought in federal court originally for lack of subject-matter jurisdiction." *Sarauer v. Int'l Ass'n of Machinists, Dist. No. 10*, 966 F.3d 661, 668 (7th Cir. 2020) (citing 28 U.S.C. §§ 1441(a), 1447(c)). This suit falls within the diversity jurisdiction. *See* 28 U.S.C. § 1332(a). There is complete diversity among the parties, as Plaintiffs are domiciled in Florida, Doc. 1-1 at ¶¶ 1-2(a), and Boeing is a Delaware corporation with its principal place of business in Illinois, *id*. at ¶ 2(b). *See Webb v. FINRA*, 889 F.3d 853, 856 (7th Cir. 2018) (Barrett, J.). The amount in controversy exceeds $75,000. Doc. 1-1 at ¶¶ 67, 70, 77, 85, 94.

That said, the removal statute provides that a case "otherwise removable solely on the basis of [diversity] jurisdiction … may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28

U.S.C. § 1441(b)(2).  Because Boeing is an Illinois citizen, § 1441(b)(2)—known colloquially as the "forum defendant rule"—bars it from removing the suit based on the diversity jurisdiction. *See Assaf v. Trinity Med. Ctr.*, 696 F.3d 681, 685 (7th Cir. 2012) ("[A]s a home-state defendant, Trinity cannot properly request removal.").  The forum defendant rule, however, does not bar removal when there is a basis for federal jurisdiction other than diversity.  *See Hurley v. Motor Coach Indus., Inc.*, 222 F.3d 377, 378 (7th Cir. 2000) (noting that the forum defendant rule bars removal only in "a non-federal question case").  Boeing maintains that this suit also falls within the admiralty jurisdiction, Doc. 1 at ¶¶ 8-15; *see* 28 U.S.C. § 1333(1), and a key jurisdictional question here is whether Boeing is correct.

Another key question is whether Boeing's removal was timely.  As a general matter, a defendant seeking to remove a case must file a notice of removal "within 30 days" after receiving "a copy of the initial pleading setting forth the claim for relief."  28 U.S.C. § 1446(b)(1).  But if "the case stated by the initial pleading is not removable," the deadline for removal extends to 30 days after "receipt by the defendant … of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable."  *Id.* § 1446(b)(3).

Boeing filed its notice of removal four months after being served with the complaint.  Doc. 1 at ¶ 1.  Plaintiffs argue that the removal was therefore untimely—regardless of whether the suit falls within the admiralty jurisdiction—and that the suit accordingly must be remanded.  Doc. 17 at 2-5.  Boeing responds that because the complaint does not clearly allege all the jurisdictional facts that make the suit removable under the admiralty jurisdiction, § 1446(b)(1)'s 30-day clock never started to run.  Doc. 24 at 2-6.

Whether the complaint made sufficiently clear that the case was removable under the admiralty jurisdiction turns on whether the case even *is* removable, and why. The broader the scope of admiralty jurisdiction (*e.g.*, if all torts relating to transoceanic air travel were admiralty torts), the more obvious it would have been from the complaint itself that this suit was removable. The narrower the scope of admiralty jurisdiction, the less obvious that would have been—and thus the more plausible Boeing's argument that the 30-day clock never started to run. And perhaps the admiralty jurisdiction is narrow to the point that this suit does not fall within it, and thus is not and never was removable.

So the court begins its analysis with the admiralty question, and only then turns to timeliness. Because the suit falls within the admiralty jurisdiction and Boeing's removal was timely, the court then addresses Plaintiffs' two other arguments for remand: that jurisdiction is precluded by the admiralty statute's saving-to-suitors clause, *see* 28 U.S.C. § 1333(1), and that Boeing waived its right to remove the case by participating in the litigation in state court. Doc. 17 at 5-7, 13-15.

### A.    Admiralty Jurisdiction

"A federal court's authority to hear cases in admiralty flows initially from the Constitution, which 'extend[s]' federal judicial power 'to all Cases of admiralty and maritime Jurisdiction.'" *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531 (1995) (alteration in *Grubart*) (quoting U.S. Const. art. III, § 2, cl. 1). By statute, the federal district courts have "original" and "exclusive" jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333(1).

Long ago, the test for admiralty jurisdiction was simple: "[It] asked only whether the tort occurred on navigable waters. If it did, admiralty jurisdiction followed; if it did not, admiralty

6

jurisdiction did not exist." *Grubart*, 513 U.S. at 531-32. Courts exercised admiralty jurisdiction under that test only if the plaintiff's alleged injury was "'wholly' sustained on navigable waters." *Id*. at 532 (quoting *The Plymouth*, 70 U.S. (3 Wall.) 20, 34 (1866)). That changed in 1948 when Congress enacted the Admiralty Extension Act, ch. 526, 62 Stat. 496 (1948), under which the admiralty jurisdiction "extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable water, even though the injury or damage is done or consummated on land." 46 U.S.C. § 30101.

The Supreme Court elaborated on the test for admiralty jurisdiction in a trilogy of cases decided between 1972 and 1990. *See Grubart*, 513 U.S. at 532-34. The first was *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1972), which involved an aircraft on a domestic route that sank in Lank Erie after colliding with a flock of seagulls as it took off from a Cleveland airport. *Id*. at 250. The Court concluded that tort suits arising from the crash were not within the admiralty jurisdiction, reasoning that "maritime locality alone is not a sufficient predicate for admiralty jurisdiction in aviation tort cases." *Id*. at 261. Rather, the Court held, admiralty jurisdiction requires "that the wrong bear a significant relationship to traditional maritime activity," and "unless such a relationship exists, claims arising from airplane accidents are not cognizable in admiralty." *Id*. at 268. Yet the Court was careful to note that it was not holding that "an aviation tort can [n]ever, under any circumstances bear a sufficient relationship to traditional maritime activity to come within admiralty jurisdiction." *Id*. at 271. And the Court recognized that an incident involving a transoceanic flight "might be thought to bear a significant relationship to traditional maritime activity because [the aircraft] would be performing a function traditionally performed by waterborne vessels." *Ibid*.

The second case was *Foremost Insurance Co. v. Richardson*, 457 U.S. 668 (1982), which arose from a collision of two "pleasure boats." *Id*. at 669. While acknowledging that the boats were not engaged in commercial activity, the Court nonetheless held that the suit was within the admiralty jurisdiction. *See id*. at 674, 677. As the Court explained, the requisite "significant relationship with maritime commerce" was present because of "[t]he potential disruptive impact of a collision between boats on navigable waters coupled with the traditional concern that admiralty law holds for navigation." *Id*. at 675.

The third case was *Sisson v. Ruby*, 497 U.S. 358 (1990), which concerned a fire aboard a "pleasure yacht" docked at a Lake Michigan marina that ultimately damaged nearby vessels and the marina itself. *Id*. at 360. Holding that the suit fell within the admiralty jurisdiction, the Court emphasized that "fire has a potentially disruptive impact on maritime commerce, as it can spread to nearby commercial vessels or make the marina inaccessible to such vessels." *Id*. at 362. And the Court observed that "the storage and maintenance of a boat at a marina on navigable waters has a substantial relationship to a 'traditional maritime activity.'" *Id*. at 365.

As the Court later explained, this trilogy of cases gave rise to the following test, which to this day governs questions of admiralty jurisdiction: "[A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must 'assess the general features of the type of incident involved' to determine whether the incident has 'a potentially disruptive impact on maritime commerce.' Second, a court must determine whether 'the general character' of the 'activity giving rise to the incident' shows a

8

'substantial relationship to traditional maritime activity.'" *Grubart*, 513 U.S. at 534 (citations omitted) (quoting *Sisson*, 497 U.S. at 363-65, 364 n.2).

As noted, Boeing argues that this suit falls within the admiralty jurisdiction. Doc. 1 at ¶¶ 8-15; Doc. 24 at 6-10. In so arguing, Boeing focuses on the fact that "[a]bout 45 minutes" into the flight, when the complaint alleges that the "dirty sock" smell was first detected, the aircraft was flying over navigable waters—specifically, "over the North Sea, the navigable northeastern arm of the Atlantic Ocean running between the British Isles to the west and southwest and the mainland of northwestern Europe to the east, south, and southeast." Doc. 1 at ¶ 11. While the complaint itself is silent about the plane's location at that time, Boeing used publicly available data to estimate the aircraft's trajectory. *Id*. at ¶¶ 10-11. Boeing alleges that these data show that Flight 71 was above water both at the time the passengers first smelled the "dirty sock" smell—about 45 minutes into the flight—and again when the flight turned around to head back to Amsterdam. *Id*. at ¶¶ 11-14. Although the complaint does not set forth this geographic information, a removing defendant's "[j]urisdictional allegations control unless it is legally impossible for them to be true (or to have the asserted consequences)." *Lu Junhong v. Boeing Co.*, 792 F.3d 805, 815 (7th Cir. 2015); *see also Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 88-89 (2014) (explaining that a removing defendant's uncontested factual allegations can support federal jurisdiction).

Boeing submits that the Seventh Circuit's opinion in *Lu Junhong v. Boeing Co.* supports the exercise of admiralty jurisdiction in these circumstances. *Lu Junhong* addressed whether the admiralty jurisdiction encompassed a tort suit arising out of the crash of Asiana Airlines Flight 214, which had departed from South Korea, into the seawall separating a runway at San Francisco International Airport from the San Francisco Bay. 792 F.3d at 807-08. Injured

9

passengers sued Boeing, the aircraft's manufacturer, in Illinois state court, and—as here—Boeing removed the suit, invoking the admiralty jurisdiction. *Ibid*.

The Seventh Circuit ruled that the suit fell within the admiralty jurisdiction. *Id*. at 818. The court observed that the evidence—which showed pilot error during landing—supported Boeing's contention that "th[e] accident was caused by, or became inevitable because of, events that occurred over navigable water." *Id*. at 815. The court held that for jurisdictional purposes, an airplane *over* water is "[n]ot functionally" different from a vessel *on* water: "An airplane, just like an ocean-going vessel, moves passengers and freight from one continent to another. It crosses swaths of the high seas that are outside of any nation's territory, and parts of the seas adjacent to the United States but outside any state's territory." *Ibid*. As for the fact that the injuries giving rise to the suit occurred on land and the legal principle that "there's no tort without injury," the Seventh Circuit explained that the admiralty jurisdiction does not "require[] the *whole* tort to occur on the water." *Id*. at 816 (emphasis added).

In so holding, the Seventh Circuit acknowledged that *Executive Jet*, the sole Supreme Court admiralty case involving an airplane, was the only modern admiralty case in which the Supreme Court rejected exercise of the admiralty jurisdiction. *See id*. at 815-16. But the Seventh Circuit understood *Executive Jet*'s holding to be limited to cases involving *domestic* air traffic, since domestic flights have only a limited relationship to "traditional maritime activity." *Id*. at 816 (quoting *Exec. Jet*, 409 U.S. at 271); *see also ibid*. (collecting cases holding that commercial, transoceanic flights are within the admiralty jurisdiction). Because the flight at issue in *Lu Junhong* was a transoceanic flight, the Seventh Circuit explained, the suit could fall within the admiralty jurisdiction. *See id*. at 815-16.

10

Under the principles articulated in *Lu Junhong*, this suit falls within the admiralty jurisdiction. The "location" test is satisfied, as Boeing has adduced—at least at this stage of the litigation—unrebutted evidence that Plaintiffs' injuries began to manifest while Flight 71 was over the North Sea. Doc. 1 at ¶¶ 10-11. (Plaintiffs' unavailing attempt to rebut this evidence is addressed below.) In *Lu Junhong*, it was sufficient for purposes of the location test that the pilot error that caused the crash occurred while the flight was over the San Francisco Bay. *See* 792 F.3d at 815 (noting that Boeing "show[ed] that th[e] accident was caused by, or became inevitable because of, events that occurred over navigable water"). Here, the argument for jurisdiction is even stronger, as the injury *itself* occurred over navigable waters. And *Lu Junhong* teaches that an injury occurring aboard an aircraft flying above navigable waters is the same, for purposes of the admiralty jurisdiction, as one occurring aboard a vessel physically on those waters. *See ibid.* ("[A]n airplane is not a 'vessel' and it was 'over' rather than 'on' the water. Does that make a difference? Not functionally.").

The "connection to maritime commerce" test is satisfied as well. As noted, that test has two components: (1) whether the incident giving rise to the suit had a "potentially disruptive impact on maritime commerce," and (2) whether "the general character of the activity giving rise to the incident" has a "substantial relationship to traditional maritime activity." *Grubart*, 513 U.S. at 534 (internal quotation marks omitted). Both components are present here.

In determining whether the incident giving rise to this suit had a "potentially disruptive impact on maritime commerce," the court must "descri[be] … the incident at an intermediate level of possible generality." *Id.* at 538. Describing the incident here as "an injury from inhalation of toxic fumes" would be too general. *See ibid.* ("To speak of the incident as 'fire' would have been too general … ."). Plaintiffs suggest that the appropriate level of generality is

11

"an airplane toxic cabin air event that made crew and passengers ill but did not cause a crash."

Doc. 17 at 13 n.4. This may be too specific. *See Grubart*, 513 U.S. at 538-39 ("[T]o have

described the fire as damaging nothing but pleasure boats and their tie-up facilities would have

ignored, among other things, the capacity of pleasure boats to endanger commercial shipping that

happened to be nearby."). But even if that description falls at the correct level of generality, such

an incident still would have a potentially disruptive impact on maritime commerce.

      As *Lu Junhong* explained, transoceanic air travel is akin to intercontinental maritime

travel, *see* 792 F.3d at 815, and serious questions about aircraft safety (in the former case) or

traditional maritime vessel safety (in the latter) can have significant effects on the respective

modes of transportation. Even in the short term, Flight 71's unexpected return to Amsterdam

had the potential to disrupt passengers' plans, delay other flights, and alter air traffic patterns in

North America and Europe and over the Atlantic. The potential (and actual) health effects of the

incident were significant as well. In *Tagliere v. Harrah's Illinois Corp.*, 445 F.3d 1012 (7th Cir.

2006), the Seventh Circuit noted that even the *possibility* that an incident could injure a

passenger has a potentially disruptive impact on maritime commerce because it could cause an

unscheduled stop for medical treatment—which is precisely what happened here. *Id*. at 1015;

*see* Doc. 1-1 at ¶¶ 18-19. The fact that Plaintiffs were crewmembers only strengthens (though is

not necessary for) a finding of potential disruption. *See Tagliere*, 445 F.3d at 1015 ("An injury

to a crewmember is somewhat more likely to affect maritime commerce than an injury to a

passenger, because the crewmember might be vital to the operation of the boat and difficult to

replace immediately. Yet even an injury to a passenger could have a disruptive effect … .").

      It does not matter for the purposes of the "potentially disruptive impact on maritime

commerce" inquiry whether the toxic air event on Flight 71 had an *actual* impact on

intercontinental commerce.  As the Supreme Court made clear in *Sisson*, "[t]he jurisdictional inquiry does not turn on the actual effects on maritime commerce" or "on the particular facts of the incident in th[e] case."  497 U.S. at 363 (emphasis omitted).  "Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity."  *Ibid.*; *see also Grubart*, 513 U.S. at 539 (holding that "damage by a vessel in navigable water to an underwater structure" satisfied the "potentially disruptive impact" inquiry); *Foremost*, 457 U.S. at 675 (relying on the potentially disruptive impact of a "collision between boats on navigable waters" to find admiralty jurisdiction, even though the boats in question were not engaged in commercial activity).  Toxic air conditions aboard a transoceanic flight, just as those aboard a vessel, have the potential to cause such a disruption.

The "substantial relationship to traditional maritime activity" component of the "connection to maritime commerce" test is satisfied as well.  At that step of the analysis, the court must consider, at an appropriately abstract level, the "the general character of the activity giving rise to the incident."  *Grubart*, 513 U.S. at 539.  As in *Lu Junhong*, the activity here was transoceanic air travel.  *See* 792 F.3d at 815.  And *Lu Junhong* held that because a transoceanic flight, "just like an ocean-going vessel, moves passengers and freight from one continent to another," it "bears a 'substantial relationship to traditional maritime activity.'"  *Ibid.* (quoting *Grubart*, 513 U.S. at 534).  That holding applies with equal force here.

With the "location" and the "connection to maritime commerce" tests satisfied, this suit falls within the admiralty jurisdiction.  Plaintiffs offer five reasons for reaching the contrary result, Doc. 17 at 10-13, but none is persuasive.

*First*, observing that the injury in *Lu Junhong* arose in part from pilot error that occurred over water, Plaintiffs argue that "[u]nlike the occurrences 'on the water' in *Lu Junhong*, Boeing's

failures in this case were *omissions* that long pre-dated Flight 71's departure from Amsterdam." *Id*. at 11 (citing Doc. 1-1 at ¶¶ 22-64). That distinction is immaterial. The "location" test asks where the tort occurred, *see Grubart*, 513 U.S. at 534, and as the Seventh Circuit emphasized in *Lu Junhong*, "there's no tort without injury," 792 F.3d at 816. In *Lu Junhong*, pilot error while the aircraft was over navigable waters was the hook for satisfying the location prong; here, the hook is the manifestation of the injury over navigable waters. Either hook suffices. *See Miller v. United States*, 725 F.2d 1311, 1312, 1315 (11th Cir. 1984) (exercising admiralty jurisdiction over a suit arising from a plane crash over international waters between The Bahamas and Florida, even though the alleged negligence took place on land); *Williams v. United States*, 711 F.2d 893, 896 (9th Cir. 1983) (finding the location prong satisfied because "the alleged negligence took effect when [the] plane crashed in the navigable waters of the Pacific") (internal quotation marks omitted); *see also Lu Junhong*, 792 F.3d at 816 (relying on *Miller* and *Williams*). Indeed, as discussed above, before the 1948 amendment to the admiralty statute, that the injury actually occur on water was a necessary predicate of admiralty jurisdiction.

*Second*, Plaintiffs submit that Flight 71 was not actually a transoceanic flight. Doc. 17 at 12. Unlike the flight in *Lu Junhong*, which departed from South Korea and landed in California, 792 F.3d at 807, the flight here "was intended to cross the Atlantic Ocean, [but] never did," Doc. 17 at 12. Given this, Plaintiffs contend that the situation here is "more akin to the continental flight at issue in *Executive Jet*," *ibid*., which the Supreme Court held had an insufficient connection with maritime commerce. *See Exec. Jet*, 409 U.S. at 274 ("[T]here is no federal admiralty jurisdiction over aviation tort claims arising from flights by land-based aircraft between points within the continental United States."). But whether Flight 71 ultimately made it across the Atlantic is irrelevant. What matters in establishing the necessary relationship to

14

maritime commerce is its *character* as a transoceanic flight, and Flight 71 indisputably was supposed to cross the Atlantic. *See Lu Junhong*, 792 F.3d at 815 (explaining that transoceanic travel is "traditional maritime activity").

*Third*, and along similar lines, Plaintiffs argue that there is no substantial relationship to maritime commerce here because "the nature of [Plaintiffs'] legal claims and factual allegations concerning Boeing's conduct … have [no]thing whatsoever to do with traditional maritime law." Doc. 17 at 12. But *Lu Junhong* teaches that a tort occurring in an airplane above navigable waters is *always* sufficiently related to traditional maritime activity. *See* 792 F.3d at 815. While Plaintiffs may prefer a test that calls for a more careful examination of the facts and legal claims when searching for a connection to maritime commerce, that is not the test the Supreme Court has framed. *See Grubart*, 513 U.S. at 541-43.

*Fourth*, Plaintiffs attempt to cast *Lu Junhong*'s jurisdictional holding as reliant on the Death on the High Seas Act, 46 U.S.C. § 30302, a statutory grant of admiralty jurisdiction that (for immaterial reasons) would not support jurisdiction here. Doc. 17 at 12-13. That argument misreads *Lu Junhong*, which did not rely on that statute. *See* 792 F.3d at 816 ("We are not saying that the Death on the High Seas Act applies to these cases. The plaintiffs do not rely on it."). Moreover, *Lu Junhong* equated the reach of the Death on the High Seas Act with the general grant of admiralty jurisdiction in 28 U.S.C. § 1333(1), the provision upon which Boeing relies here. *See* 792 F.3d at 816 ("The Supreme Court's holding in *Offshore Logistics* [*v. Tallentire*, 477 U.S. 207 (1986),] that an accident caused by problems in airplanes *above* water should be treated, for the purpose of § 30302, the same as an accident caused *on* the water carries the implication that the general admiralty jurisdiction of 28 U.S.C. § 1333(1) also includes accidents caused by problems that occur in trans-ocean commerce.").

15

*Fifth*, Plaintiffs suggest that "Boeing's present removal is based on a considerably broader conception of admiralty jurisdiction than the one it seems to have advanced in *Lu Junhong*." Doc. 17 at 13. Specifically, Plaintiffs maintain that while "in *Lu Junhong*, the court couched Boeing's position as hinging on a 'maritime cause,' meaning 'a cause that occurred while the plane was over navigable waters,'" Boeing argues here that "any 'occurrence' will do and any passage over water will suffice." *Ibid*. (emphasis omitted). This contention does nothing more than rehash Plaintiffs' argument about the location test. As noted above, the fact that Plaintiffs' injury first manifested over navigable waters satisfies the location test under *Lu Junhong*. And Boeing is not foreclosed from advancing a different or broader jurisdictional theory here just because a narrower one sufficed in *Lu Junhong*. The court's lodestar is what the Seventh Circuit held in *Lu Junhong*, not what Boeing argued there.

Before proceeding, it bears mention that *Lu Junhong* does not stand for the proposition that *any* tort suit resulting from an occurrence aboard a transoceanic flight automatically falls within the admiralty jurisdiction. *Lu Junhong* takes a broad view of admiralty jurisdiction, but it does not purport to displace the location test articulated by the Supreme Court. In fact, it is necessary in light of the timeliness discussion below to emphasize that if *no* part of the alleged tort here occurred over navigable waters, this suit would not be an admiralty case. *See Lu Junhong*, 792 F.3d at 815-16 (suggesting that some part of the tort must occur on or over navigable waters for the suit to fall within the admiralty jurisdiction). It is therefore critical here that, at least as it appears at this juncture, the "dirty sock" smell was first detected while Flight 71 was flying above the North Sea. Doc. 1 at ¶¶ 10-11.

Plaintiffs question that factual premise, citing a Dutch Safety Board report on the Flight 71 incident. Doc. 43-1. The report describes the flight's plight as follows:

> *An hour into the flight*, while flying straight and level at FL320 over Scotland, *a growing number* of the aeroplane's occupants *indicated they were not feeling well*. Eventually all cabin crew and fifteen passengers (most of them from rows 27 through 30) were reporting similar symptoms. These included blurred vision, sensations of the aeroplane banking to the right and climbing, nausea and a general feeling of drowsiness.

*Id*. at 9 (emphasis added). In Plaintiffs' view, Doc. 43, the report defeats Boeing's submission that the injury occurred while Flight 71 was over the North Sea, for while Boeing maintains that the flight was over navigable waters *45 minutes* after takeoff, according to the report the critical jurisdictional moment—when "a growing number of" crew members and passengers began to feel ill—was "*[a]n hour* into the flight," while the plane was over (Scot)land. Doc. 43-1 at 9 (emphasis added). It follows, according to Plaintiffs, that the "location" test for admiralty jurisdiction is not satisfied.

The flaw in Plaintiffs' argument is that the "45 minutes" data point does not come from Boeing; rather, it comes from Plaintiffs' own complaint. Doc. 1-1 at ¶ 17 ("About 45 minutes into the flight, there was a contaminated air event onboard when flight crew and passengers reported a 'dirty sock' smell."). All Boeing adds in its notice of removal is that 45 minutes into the flight, when the complaint alleges the "dirty sock" smell was *first detected*, the aircraft was over the North Sea—an assertion that the Dutch report does not call into question. Doc. 1 at ¶¶ 9-11. Even assuming the report is fair game for purposes of Plaintiffs' remand motion— which is questionable, as the report categorizes the Flight 71 incident as an "occurrence[] that ha[s] not been investigated extensively," Doc. 43-1 at 9—the court considers it only insofar as it is consistent with Plaintiffs' allegations in the complaint. *Cf. Phillips*, 714 F.3d at 1019-20 (binding a plaintiff attempting to submit additional facts in opposing a motion to dismiss to the facts alleged in the complaint). "An hour," Doc. 43-1 at 9, is not "[a]bout 45 minutes," Doc. 1-1 at ¶ 17, and thus the Dutch report cannot displace the complaint's factual allegation as to the

timing of the contaminated-air event. So even considering the report, the court takes for true two facts: (1) about 45 minutes into the flight, passengers first detected a "dirty sock" smell, Doc. 1-1 at ¶ 17; and (2) an hour into the flight, the number of passengers and crew "indicat[ing] they were not feeling well" was "growing," Doc. 43-1 at 9.

As explained above, fact (1) is enough to satisfy admiralty jurisdiction's location test. And because fact (2) does not undermine fact (1), Boeing's jurisdictional allegations stand. *See Lu Junhong*, 792 F.3d at 815 ("Jurisdictional allegations control unless it is legally impossible for them to be true (or to have the asserted consequences)."). It therefore is unnecessary to decide whether this suit would fall within the admiralty jurisdiction if the "dirty sock" smell had first been detected while the aircraft was over land. And the court notes for good measure that amending the complaint to allege that the "dirty sock" smell was detected one hour (instead of 45 minutes) into the flight would be unlikely to earn Plaintiffs a remand. *See In re BNSF Ry. Co.*, 606 F.3d 379, 380 (7th Cir. 2010) ("The well-established general rule is that jurisdiction is determined at the time of removal, and nothing filed after removal affects jurisdiction. … And though it is sometimes possible for a plaintiff who sues in federal court to amend away jurisdiction, removal cases present concerns about forum manipulation that counsel against allowing a plaintiff's post-removal amendments to affect jurisdiction.").

### B. Timeliness of Removal

As noted, Boeing removed this suit to federal court more than 30 days after being served with the complaint. Doc. 1 at 1, 10. Boeing argues, however, that the 30-day removal clock under 28 U.S.C. § 1446(b)(1) never started because it is not clear from the face of the complaint that this suit is within the admiralty jurisdiction. Doc. 24 at 2-6. Boeing is correct.

The Seventh Circuit has adopted a "bright-line rule" to ascertain the time when the 30-day clock starts: "The 30-day removal clock does not begin to run until the defendant receives a

pleading or other paper that *affirmatively and unambiguously* reveals that the predicates for removal are present." *Walker v. Trailer Transit, Inc.*, 727 F.3d 819, 824 (7th Cir. 2013) (emphasis added). The "timeliness inquiry is [therefore] limited to … examining [the] contents of the clock-triggering pleading or other litigation paper; the question is whether *that document*, on its face or in combination with earlier-filed pleadings, provides specific and unambiguous notice that the case satisfies federal jurisdictional requirements and therefore is removable." *Id*. at 825. In determining whether removal was timely, the court pays no mind to "what the defendant subjectively knew or should have discovered through independent investigation." *Ibid*. So if no pleading or other paper makes the unambiguous showing that the case is removable, "the removal clock never actually start[s] to run." *Ibid*.

As Plaintiffs observe, "the only pleading [they] have filed to date is the complaint." Doc. 17 at 3 (emphasis omitted). Plaintiffs therefore are right to say that the timeliness inquiry turns on "whether the complaint 'facially reveal[ed] that the grounds for removal are present.'" *Ibid*. (alteration in original) (quoting *Walker*, 727 F.3d at 825). Plaintiffs contend that "when Boeing read the complaint," it should have realized immediately that "the flight *had* to go over water at some point" on its journey from Amsterdam toward Newark and then back to Amsterdam—and thus that the suit was removable. Doc. 17 at 3-4. Plaintiffs do not concede that this *is* an admiralty case, but they argue that under *Boeing's* jurisdictional theory, the 30-day clock started when the complaint was served. *See ibid*.

If every tort related to a transoceanic flight fell within the admiralty jurisdiction, Plaintiffs' argument would have force. But as explained above, one prong of the admiralty jurisdiction test turns on the tort's location. The complaint alleges only that the "dirty sock" smell manifested about 45 minutes into the flight; it does not say anything about the plane's

19

geographic location at that point in time. Doc. 1-1 at ¶ 17. And because the plane's geolocation

at the time the "dirty sock" smell was detected is a key data point toward establishing admiralty

jurisdiction, the complaint does not "affirmatively and unambiguously reveal[] that the

predicates for removal are present," *Walker*, 727 F.3d at 824, and therefore never triggered the

30-day removal clock.

Perhaps, as Plaintiffs suggest, it nonetheless was fairly straightforward for Boeing to map

out Flight 71's path and determine that the aircraft was above the North Sea 45 minutes into the

flight. Doc. 17 at 4-5 ("Plaintiffs' counsel conducted internet research to attempt to replicate

Boeing's efforts. … [It] did not take four months. It took less than half an hour."). That

argument misses the point of *Walker*'s bright-line rule. It does not matter under *Walker* how

quickly a diligent defendant could determine that a case is removable, for if the complaint leaves

*any* work for the defendant to do in that regard, the removal clock does not start to run. It

therefore does not matter whether it ought to have taken Boeing four months, or thirty minutes,

or five seconds to ascertain the missing fact that would establish admiralty jurisdiction. The 30-

day clock never started, so Boeing's removal was timely—regardless of precisely when it knew

or should have known that this suit fell within the admiralty jurisdiction. In so holding, the court

respectfully disagrees with the contrary result reached in a similar case, *Milton v. Boeing Co.*,

No. 20 C 3089 (N.D. Ill.), ECF No. 30 (Aug. 12, 2020).

### C. The Saving-to-Suitors Clause

As noted, the admiralty jurisdiction statute provides that "[t]he district courts shall have

original jurisdiction, exclusive of the courts of the States, of … [a]ny civil case of admiralty or

maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise

entitled." 28 U.S.C. § 1333(1). Plaintiffs argue that the provision's last clause—the "saving-to-

suitors" clause—bars removal. Doc. 17 at 13-15. Specifically, Plaintiffs contend that one of the

preserved "remedies" referenced by the clause is the admiralty plaintiff's right to select a state court forum without facing removal.

The saving-to-suitors clause operates "as a grant to state courts of *in personam* jurisdiction, concurrent with admiralty courts." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 444 (2001). While § 1333(1) makes federal jurisdiction exclusive in the case of *in rem* admiralty suits, admiralty jurisdiction is shared for *in personam* suits like the one here. *See Madruga v. Superior Ct.*, 346 U.S. 556, 560-61 (1954) ("Admiralty's jurisdiction is 'exclusive' only as to those maritime causes of action begun and carried on as proceedings *in rem*, that is, where a vessel or thing is itself treated as the offender and made the defendant by name or description in order to enforce a lien. It is this kind of *in rem* proceeding which state courts cannot entertain. But the jurisdictional act does leave state courts 'competent' to adjudicate maritime causes of action in proceedings '*in personam*,' that is, where the defendant is a person, not a ship or some other instrument of navigation.") (citation omitted). And the saving-to-suitors clause acts to preserve a plaintiff's choice of forum, not only allowing the plaintiff to bring an *in personam* suit in state court, but also restricting the defendant's ability to remove such a suit. *See In re Chimenti*, 79 F.3d 534, 537-38 (6th Cir. 1996) ("Section 1333, which provides a basis for federal jurisdiction in *in personam* actions if the claimant so chooses, provides no basis for removal if the claimant does not so choose."); *see also Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 372 (1959) (explaining that "the unquestioned aim of the saving clause" is to "preserve" the "traditionally exercised jurisdiction of the state courts in admiralty matters").

But there is an exception to the principle that the admiralty plaintiff gets the final say on forum: If there is some basis for federal jurisdiction *other* than admiralty—such as the diversity jurisdiction or the federal question jurisdiction—the defendant retains its usual ability to remove

21

the suit to federal court.  *See Brown v. Porter*, 149 F. Supp. 3d 963, 969 (N.D. Ill. 2016)

(collecting cases); *see also* 14A Miller *et al.*, *supra*, § 3674 ("[S]aving clause cases theoretically

are removable, and a number of cases so hold, only if all of the elements of diversity

jurisdiction—complete diversity of citizenship among these contesting parties and the requisite

amount in controversy—or some other federal subject-matter jurisdiction basis is present in the

action. … [A]n independent basis of federal jurisdiction and satisfaction of all the removability

prerequisites will trump an otherwise nonremovable state initiated saving-to-suitors action.")

(footnotes omitted).

  As explained above, the jurisdictional facts alleged here indisputably place this suit

within the diversity jurisdiction.  Doc. 1-1 at ¶¶ 1-2(b), 67, 70, 77, 85, 94; Doc. 17 at 15; Doc. 24

at 12.  But Plaintiffs give two reasons why the saving-to-suitors clause still bars removal.

  *First*, Plaintiffs argue that because the forum defendant rule of 28 U.S.C. § 1442(b)(2)

prohibited Boeing from removing this suit on diversity grounds, the existence of diversity

jurisdiction cannot provide a way around the saving-to-suitors clause.  Doc. 25 at 5-6.  This

argument falters because whether § 1442(b)(2) allows a defendant to remove a case within the

federal jurisdiction is a question of removal *procedure* unrelated to the *substantive* question of

whether the suit in fact falls within the federal jurisdiction.  *See Thornton v. M7 Aerospace LP*,

796 F.3d 757, 764 (7th Cir. 2015) ("Whether the case was properly removed to federal court [in

light of § 1441(b)(2)] is a matter of removal procedure, not jurisdiction."); *Morris v. Nuzzo*, 718

F.3d 660, 665 (7th Cir. 2013) (same); *Holmstrom v. Peterson*, 492 F.3d 833, 836 (7th Cir. 2007)

("[F]ailure to comply with § 1441(b)'s forum defendant rule does not result in a lack of subject

matter jurisdiction … .").  It follows that the procedural bar on removal imposed by § 1446(b)(2)

does not disturb the fact that this suit's falling within the diversity jurisdiction creates an

"independent basis for federal subject matter jurisdiction" for purposes of the saving-to-suitors clause. *Brown*, 149 F. Supp. 3d at 969.

*Second*, Plaintiffs contend that because the complaint undoubtedly "inform[ed] Boeing of the predicates for diversity removal," removal premised on diversity jurisdiction "is a ship that has now sailed" because Boeing removed the suit more than 30 days after the diversity removal clock started. Doc. 17 at 15. That contention fails as well. Although the complaint made clear that the requirements for diversity jurisdiction were satisfied, it did not make clear that the case was *removable*. Due to § 1442(b)(2), Boeing—an Illinois citizen—could not have removed the suit based solely on the diversity jurisdiction. So for the case to be removable, it had to meet the predicates for admiralty jurisdiction (because of the forum defendant rule of § 1442(b)(2)) *and* diversity jurisdiction (because of the saving-to-suitors clause of § 1333(1)). And as explained above, the complaint did not "affirmatively and unambiguously" allege that the predicates for admiralty jurisdiction were satisfied. *Walker*, 727 F.3d at 824. It follows that the complaint itself did not start the 30-day clock as to diversity jurisdiction, just as it did not start the clock as to admiralty jurisdiction.

In sum: The saving-to-suitors clause bars removal to federal court of an admiralty case filed in state court. But that bar does not apply when there is a basis for federal jurisdiction other than admiralty. Here there is such a basis, the diversity jurisdiction. The forum defendant rule of § 1442(b)(2) does not bar removal because diversity is not the sole basis for federal jurisdiction, and because diversity alone is also not a *sufficient* basis for removal, the complaint did not trigger the 30-day removal clock. Boeing's removal was therefore valid and timely.

### D.     Waiver

Plaintiffs also argue that Boeing waived its right to remove this case by participating in the litigation in state court.  Doc. 17 at 5-7.  The timeline of Boeing's relevant state court activity is as follows:

- January 17, 2020: Plaintiffs filed the complaint in state court and served Boeing. Doc. 1-2 at 2-3.

- February 6, 2020: Boeing's counsel entered an appearance, *id*. at 10, and Boeing requested an extension of time to respond to the complaint, *id*. at 11-12.

- February 27, 2020: The parties jointly moved to consolidate this suit with a second toxic cabin air case captioned *Milton v. Boeing Co. Id*. at 24-26.  The stated intent of the motion was to consolidate the cases "for the purposes of discovery only."  *Id*. at 24.  The parties also stated that consolidation "will not … change the rights of parties" or "cause prejudice to a substantial right of any party."  *Id*. at 25.

- March 6, 2020: The parties filed a joint motion for an extension of Boeing's time to respond to the complaint.  *Id*. at 27-29.

- March 13, 2020: The state court granted the joint motion to consolidate this suit with *Milton* for discovery purposes.  *Id*. at 48.

- May 25, 2020: Boeing filed a notice of removal.  Doc. 1.

The question for the court is twofold: (1) whether the extent of a defendant's participation in a suit in state court can operate as a waiver of its right to remove the case to federal court; and (2) if so, whether Boeing's participation here effectuated such a waiver.

In *Rothner v. City of Chicago*, 879 F.2d 1402 (7th Cir. 1989), the Seventh Circuit held that 28 U.S.C. § 1447(c), which governs motions to remand, does not allow district courts to remand on the ground that a defendant's participation in the litigation in state court waived its right to remove the suit.  *See id*. at 1415-16.  But following an amendment to § 1447(c), district courts in the Seventh Circuit have occasionally granted motions to remand on waiver grounds. *See Fate v. Buckeye State Mut. Ins. Co.*, 174 F. Supp. 2d 876, 881 (N.D. Ind. 2001) (explaining that § 1447(c) no longer "limit[s] the kinds of challenges that can be brought," and thus that

"waiver—or a defendant's failure to remove the case before it has been considered at length in state court—qualifies as a defect in a defendant's attempt to remove a case"); *see also*, *e.g.*, *Towne v. Am. Fam. Mut. Ins. Co.*, 2010 WL 680344, at *5 (S.D. Ind. Feb. 22, 2010) (finding waiver where the defendant removed the suit only after the state court denied its motion to dismiss).

Even if those decisions correctly interpreted the amended § 1447(c) to allow district courts to remand on the ground that the defendant's participation in the litigation in state court waived its right to remove, Boeing's minimal participation in state court did not do so here. Seeking an extension to file a responsive pleading does not move the litigation forward in any way and does not qualify as participation for waiver purposes; indeed, the weight of authority suggests that even answering the complaint is not grounds for waiver. *See* 14C Miller *et al.*, *supra*, § 3721 & n.100 (collecting cases); 16 *Moore's Federal Practice* § 107.132[2][a] & n.10 (Matthew Bender 3d ed. 2021); *see also*, *e.g.*, *Robertson v. U.S. Bank, N.A.*, 831 F.3d 757, 760-61 (6th Cir. 2016). Similarly, cases abound in which even substantive participation in discovery did not result in waiver. *See* 14C Miller *et al.*, *supra*, § 3721 & n.100 (collecting cases); *see also*, *e.g.*, *Kadambi v. Express Scripts, Inc.*, 2014 WL 11428187, at *2-4 (N.D. Ind. Apr. 21, 2014).

The court agrees with those authorities. Accordingly, because Boeing merely sought an extension to file a responsive pleading and joined a procedural motion concerning discovery, and because no discovery was produced, nothing that Boeing did in the state court "betray[ed] a commitment to litigate the case" there. *Robertson*, 831 F.3d at 761. It follows that Boeing did not waive its right to remove this suit to federal court.

\* \* \*

This suit falls within the admiralty jurisdiction. Boeing's removal was timely and is not barred by the saving-to-suitors clause. Nor did Boeing waive the right to remove the suit through its minimal participation in state court. Removal was therefore proper, and Plaintiffs' motion to remand is accordingly denied.

## II.     Boeing's Partial Motion to Dismiss

Boeing moves to dismiss Count IV (fraud) and Count V (*res ipsa loquitur*). Doc. 10. The court considers each in turn, and *sua sponte* addresses Count VI (damages).

### A.     Count IV (Fraud)

Civil Rule 9(b) imposes a heightened pleading standard for fraud claims. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736-37 (7th Cir. 2014). "While the precise level of particularity required under Rule 9(b) depends upon the facts of the case, the pleading 'ordinarily requires describing the who, what, when, where, and how of the fraud.'" *Camasta*, 761 F.3d at 737 (quoting *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011)); *see also Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) ("[T]he reference to 'circumstances' in [Rule 9(b)] requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.") (some internal quotation marks omitted).

Boeing argues that Count IV does not satisfy that standard. Doc. 11 at 4-9. Plaintiffs agree and ask for a chance to amend. Doc. 20 at 4-5. Count IV is therefore dismissed without prejudice, and Plaintiffs will be given an opportunity to amend to comply with Rule 9(b). *See O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 628 (7th Cir. 2020) ("[A] court should allow at least one opportunity to amend the complaint … ."); *Bausch v. Stryker Corp.*, 630 F.3d 546, 562

(7th Cir. 2010) ("As a general matter, Rule 15 ordinarily requires that leave to amend be granted at least once when there is a potentially curable problem with the complaint or other pleading.").

### B. Count V (*Res Ipsa Loquitur*)

"The doctrine of res ipsa loquitur permits an inference of liability on the part of the defendant if the plaintiff can demonstrate that certain conditions existed making it likely that the defendant was responsible for the injury." *Ruark v. Union Pac. R.R. Co.*, 916 F.3d 619, 626 (7th Cir. 2019). "To establish this inference of negligence, the plaintiff must demonstrate: (1) that the injuring instrumentality was within the exclusive management and control of the defendant, and (2) that the accident is of the type that does not ordinarily happen if those who have the management and control exercise proper care." *Maroules v. Jumbo, Inc.*, 452 F.3d 639, 642 (7th Cir. 2006); *see Heastie v. Roberts*, 877 N.E.2d 1064, 1076 (Ill. 2007).

The parties dispute the substantive applicability of *res ipsa loquitur* under the facts and circumstances of this case. In Count V, Plaintiffs allege that the aircraft and its bleed-air system were "under Defendant Boeing's exclusive control and management." Doc. 1-1 at ¶ 89. Boeing challenges this as a "conclusory legal allegation" given that "the complaint makes clear that United Airlines, not Boeing, was operating the aircraft at the time the alleged event occurred." Doc. 11 at 10. Plaintiffs respond that the exclusive control requirement of *res ipsa loquitur* is satisfied because "the alleged negligence occurred in the design and construction of the airplane's bleed air system," a period during which Boeing *did* have exclusive control. Doc. 20 at 8.

This back-and-forth misses a larger point, which is that *res ipsa loquitur* "describes not a substantive claim, but a manner of proceeding on that claim." *Ruark*, 916 F.3d at 625. *Res ipsa loquitur* is nothing more than a means for proving negligence or strict liability; put differently, it "is a rule of evidence and not a separate theory of recovery." *Prado v. Evanston Hosp.*, 390

N.E.2d 1270, 1272 (Ill. App. 1979); *see also Heastie*, 877 N.E.2d at 1081 ("[T]he res ipsa

loquitur doctrine is a species of circumstantial evidence."); *Samansky v. Rush-Presbyterian-St.*

*Luke's Med. Ctr.*, 567 N.E.2d 386, 394-95 (Ill. App. 1990) (explaining that *res ipsa loquitur*

applies in the strict liability context).  Because *res ipsa loquitur* does not qualify as a separate

cause of action, Count V is dismissed.

If the complaint's only viable theory of liability rested on *res ipsa loquitur*, then it might

be appropriate to evaluate the doctrine's applicability at the motion to dismiss stage.  But Boeing

does not move to dismiss the core strict liability and negligence claims.  Doc. 16 at 34-39

(answering Counts I, II, and III).  And given that *res ipsa loquitur* is merely an evidentiary

theory that may be used to prove negligence or strict liability, Plaintiffs could rely upon that

theory later in the litigation even if the complaint did not mention it.  *See In re Chi. Flood Litig.*,

1993 WL 278553, at *15 (N.D. Ill. July 20, 1993) (explaining that the question whether to

dismiss a separately pleaded *res ipsa loquitur* count is "largely academic" because, even were

the count dismissed, "plaintiffs would still be entitled to pursue their *res ipsa loquitur* theory

under their negligence counts").  With that point in mind, it is unnecessary at this early stage of

the litigation to say anything about the merits of Plaintiffs' *res ipsa loquitur* theory.

**C.    Count VI (Damages)**

Count VI purports to assert a "damages" claim.  Doc. 1-1 at ¶ 95.  The entirety of the

count is this paragraph:

> Boeing's conduct caused Plaintiffs short term and long term health problems
> and injuries including pain, suffering, mental anguish, emotional distress,
> physical impairment, loss of normal enjoyment of life, medical bills and
> expenses as well as loss of wage earning capacity, in the past as well as
> reasonably anticipated in the future.

*Ibid.*

With the understanding that district courts are not "encourage[d]" to dismiss claims *sua sponte*, they may do so if "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Zellner v. Herrick*, 639 F.3d 371, 378 (7th Cir. 2011) (internal quotation marks omitted). Count VI relates only to a possible remedy and does not allege any cause of action. It ought to be captioned as a "Prayer for Relief," not as a separate count, so the court will not strike it from the complaint altogether. But it is not a viable cause of action, and it is dismissed to the extent it purports to be.

## Conclusion

Plaintiffs' motion to remand is denied. Boeing's partial motion to dismiss is granted. Count IV is dismissed without prejudice to repleading, and Count V is dismissed without prejudice to Plaintiffs attempting to use *res ipsa loquitur* to prove their negligence and strict liability claims. Count VI is dismissed without prejudice to Plaintiffs seeking damages if they prove liability. Plaintiffs have until April 12, 2021 to file an amended complaint. If Plaintiffs do not attempt to amend Count IV, the dismissal of Count IV will convert automatically to a dismissal with prejudice.

March 22, 2021

_____

Gary Feinerman
United States District Judge